The last case to be heard today is USA v. Raniere and Bronfman. Mr. Tully? Is Mr. Tully participating by Zoom? Yes, Judge. Joseph Tully present. Yes, go ahead. Thank you. Joseph Tully on behalf of Mr. Raniere. I would like to thank the court for letting me appear remotely, and I am honored to be here to argue before this court. The two points that I'm going to hit are the Sixth Amendment violation, as well as the commercial setback instruction supplement. The Sixth Amendment violation is that Mr. Raniere was denied a Sixth Amendment right under Crawford v. Washington, 41 U.S. 36, 2004, when the court prematurely terminated the defense counsel's cross-examination of the government's key cooperating witness. I respectfully request that this court remand this case to the district court. The witness at issue from which Mr. Raniere's trial counsel was cut off was the cooperating co-defendant. She had pled guilty to racketeering and conspiracy to racketeering or testify. Again, she was the key witness for the government. She was the only government witness to plead and testify. The court, during cross-examination, cut off cross-examination very abruptly. It did so after curating the defense question, and specifically telling the witness that she could answer that question. Then the witness started to answer the question, the court cut her off, and then terminated the cross-examination by saying, counsel, you're done, and did this in front of the jury called defense counsel that he could no longer ask any questions. But here's the key point. The court then solicited more questioning from the government. Twice, the court said, after terminating defense counsel's cross-examination, told the government, do you have any questions? Well, the government generally gets to ask some questions. I mean, it goes back and forth, right? You have direct, you have cross, you have redirect, recross. So your view is that a cross can't be terminated unless the court also denies a redirect? No, my view is that the court can't later claim that it was a composure break needed for the witness because the court offered the government the ability to solicit further questioning. So the excuse that this was a composure break cannot apply in this case due to that fact. Well, how long was the cross relative to the direct? In terms of proportionality, I'm not certain. Is that relevant? I don't believe that it is because cross-examination doesn't have to be proportional to direct for either side, for either the government or the defense. The defense might have been planning a very long cross-examination. I don't think here that the record establishes that the defense had had a full and fair opportunity to confront and cross-examine the witness. So in terms of where the defense is going, the record is absolute proof that the defense did not get to ask all the questions that the defense wanted. The trial counsel was trying to establish a defense for this key witness and was not able to do that. And because of that denial, the Sixth Amendment was violated here. Well, you identified a number of things that I guess would have been gone into, but many of these things were already addressed and certainly before the jury, right? Including, I guess, the length of time that the cooperator was looking at, right? That was, however, I think that the intent of the GOST group, as perceived by this witness, was crucial to this case. And the defense is not allowed specifically to get into that area. And that was one of the main defenses that the defense counsel was obviously trying to establish. And the court stepped in and stopped that from occurring. Counsel, could you address another point? And that is the admission of the evidence that links to abortion, which is clearly prejudicial, but which is said to be probative with respect to the age of one of the people who were allegedly maltreated by your client. Could you address the degree of probative? Because, you know, our cases are very, very easy under district court being able to make that judgment. But I'd like to hear a little bit more about validity. Judge Calabresi, I think you're right on point here. It was not probative, and any slight probative value was far outweighed by its prejudicial effect on the jury. Here, the government needed to establish that there was a relationship between Mr. Renneri and that individual, and perhaps the beginning, the genesis of that relationship, the age of the parties during that relationship. But the aspect of the abortion had nothing to do with that. I mean, it was minimally probative. It was easily proved and had been proved with other evidence, and yet was allowed in. It was extremely prejudicial. Thank you. Moving on to the Commercial Sex Act, the court or the jury, as instructed, was given the law by the judge. A commercial sex act is any sex of which value is given to or received by any person because of such sex act. And then later on, a thing of value need not involve a monetary instrument and need not have any financial component. By eliminating the quid pro quo causal relationship, the court defined, or the court's definition of a commercial sex act. Counsel, is there any reasonable difference between because of and on account of? I mean, we view both interchangeably so often. Well, so here there needs to be a quid pro quo causal relationship. That has to happen. Otherwise, any sex act, or nearly any sex act, is to be a commercial sex act. The unions that resulted in the makeup of this court would be a commercial sex act. Any sex act where somebody buys the other partner dinner afterwards would be a commercial sex act. My hypotheticals in my supplement remain true. Counsel, counsel, I'm not saying that the question of whether this was for value in this case isn't closed. It would be closed. I'm just saying that the argument that it is made reversibly closed by the use of a word because of rather than on account of just doesn't strike me as going anywhere. The argument is that somehow there wasn't enough evidence. Well, again, our cases are pretty strong in letting them go to the jury. I'm interested that the jury found what it found. No, again, so I think on account of implies more of a quid pro quo relationship. And I'm not necessarily limiting my argument to on account of or because of being tantamount to being acceptable either. There needs to be a quid pro quo causal relationship. Again, other than that, my hypothetical of a boss and his wife having a marital relations one night and the buying his staff lunch the next day because he's in a good mood would be a commercial sex act. So is a third point. You reach an absurd conclusion, and it's this obligation to stop absurdity in the law from occurring. Now, Mr. Tully, I just want to note for the record I have given you twice as much time as you originally allocated, but that's fine. I just want to point out that you will reserve one minute rebuttal. But I have a clerical question for you to clarify the record. Have you submitted as part of the record an unredacted copy of the memorandum and order that were that was issued by Judge Garifuss on May 3, 2019, ruling on your motions in limine? Do you remember that? I don't recall that. Well, maybe Mr. Sullivan will have something to add to that. But in any event, why don't you just make a note of it? Judge Garifuss on May 3, 2019, ruled on your motions in limine. And he did so in an unredacted memorandum and order. And so the question is whether that ought to be part of the record here. I assume so. So perhaps you can arrange with the clerk's office to submit an unredacted copy by tomorrow at the close of business, Eastern Time. Thank you. I will do so. Thank you. Thank you very much. We'll hear from Mr. Sullivan. Thank you, Judge Cabranes. And may it please the court, Ronald Sullivan on behalf of Clara Bronfman. And today I'm asking the court to vacate the sentencing of Ms. Bronfman and to remand to the district court because it was procedurally unreasonable and procedurally unreasonable for three principal points. First, Your Honor, the district court came up with this theory of willful blindness. And it was at least a part of the reason why the court variated from the guidelines so much. And to make the point here, it was an upward departure by 200 percent, gave Ms. Bronfman more than two years than even the government asked for. And it was based in part on this erroneous fact. Counsel, I have terrible trouble with any of your arguments as to procedural error. The comment about willful blindness really goes to the background of what she was doing. It wasn't that he found that she was involved in the narrower and most vicious cult. It doesn't go to that. It goes to general things. It seems to me that most of your argument, all three parts really go to the size of this sentence in the light of what the guidelines are and the government's request and what people who were involved in it more seriously, crimes more serious than hers, actually got. Now, none of those are procedural things. But aren't they the things we should look at to decide whether this sentence was substantively simply too high? Judge Gutman was influenced by the fact that she had money, as he said, and that he used the money to help her, quote, Raniere, in his defense, which she has a perfect right to do. But isn't that really what you're arguing, rather than these procedural things? That is certainly— No, you're very tough on saying something is substantive. But if that's the argument, I'd like to hear it. That is certainly one of the arguments, and we would ask the court to vacate on any of those bases. But yes, the third basis is what the court just mentioned. The second, just for the record, is a notice argument, which I will come back to. But yes, there was disproportionate, grossly disproportionate sentencing as compared to everyone else in the case. Now, if the court will bear with me, I'm going to focus on Codefendant Mack, Codefendant Salzman, and then Codefendant Russell. With respect to Codefendant Mack, the court said, quote, her cruelty, lies, manipulation, apparent sadistic pleasure in watching DAS members suffer, and her creative enthusiasm when it came to developing new ways to debase them, he chastised her on that basis. Mack is a cooperator, right? Mack is a cooperator. How is Mack similarly situated with your client? Because Mack was different from my client, and that is our point. The court found that she engaged in some of the, in the court's words, helped Mr. Amiri implement some of the most twisted, manipulative, harmful- That can't go to procedural error, because we have said a thousand times that what is done with respect to a co-conspirator is not relevant on that, is not procedurally relevant, and certainly the fact that somebody was a cooperator may turn different. So, again, it may go to whether the sentence is in the range of the possible, but I don't see how it raises any procedural questions. This can be strictly a 3553A6 argument here, because with respect to co-defendant Mack, she received 80% lower than what the guideline range is. With respect to co-defendant Salzman, no time at all. The closest, the closest to my client, Ms. Bronfman, is Russell. Russell was a non-violent, first-time offender. Ms. Bronfman, non-violent, first-time offender. Russell was a non-cooperator. Ms. Bronfman was a non-cooperator. Russell was not involved in DOS. Ms. Bronfman was not involved in DOS. Ms. Russell got zero time, no time. Ms. Bronfman got nearly seven years. So, in terms of the statutory requirement that there not be an unwanted sentencing disparity, we have a clear case here, based on the relative culpability of all involved, that this is disparate. Russell's guidelines were six to 12 months, right? Russell's were six to 12 months, and it was, and departed down to zero. Ms. Bronfman's was 21 to 27 months, 200% upward departure to 87. Those two are pretty similar in terms of what their relative culpability is. The only difference runs us back into this question of willful blindness. And I will say, Judge Calabresi, in terms of the procedural questions, there's also an important notice question that I just want to raise in this court. I see my time is up, and I have not finished the point. An important notice point. Fundamental, fundamental to the criminal justice system is the notion of notice. The accused has to have notice of what she is being punished for and an opportunity to respond. The very first time this notion of willful blindness came before anybody was when the judge pronounced sentence. Pre-trial didn't mention it. The government never argued, and certainly we didn't. It was at this moment of sentencing, the court put in, the district court put in this notion of willful blindness. There was no notice. It was indisputably a basis for the court's decision. And Ms. Sorkin and others have said that if it is a basis of decision, then we have to have notice. Ms. Brothman has to have notice and the ability to respond. But you're quibbling with the characterization or the use of a phrase. But the facts referenced by that phrase were pretty well explained by Judge Garifas, right? He basically gave an upward departure because he found that your client, in his words, demonstrated an allegiance to Ranieri, whatever the cost, whomever it hurts, that was relevant to the 3553A factors. And she was basically, even when she learned of Ranieri's more egregious conduct, she doubled down as he described it. Those facts weren't new. Those were all based on facts that were well before both parties, right? Absolutely not. The use of willful blindness Never mind willful blindness. That's a phrase that I think you've injected a lot of meaning into. I'm saying the fact of her doubling down on Ranieri, of her hurting folks who chose to criticize the, not Doss, Nexium. I never know how to pronounce it. Nexium, correct. That's what Judge Garifas was talking about as the basis for his upward departure. Absolutely not. The court said, and I quote, while she may not have known about Doss before receiving the emails in September 27, so it's referencing the time when Doss was existing. Counsel, suppose the court had given a sentence of 34 months, somewhat upward departure, not that much. And it used the term willful blindness. Would you be talking about that here? It would be obviously The procedural error, it doesn't matter how much the change in sentence is made. If it's not a procedural error, then something else. But would you be making the arguments you are making about notice, about this, about bananas, about the others, if the sentence had not been as severe as it is? On this part of the argument, yes. If it had been 34 months, if it had been anything over the guidelines, yes. The court is not, the district court is not allowed to rely on an erroneous fact in order to pronounce sentence. And Ms. Bronfen will have had notice. So I think no matter what the upward departure was, yes, we would be here. The fact that it is so exaggerated really speaks to the justification needed in order for that sentence to remain valid. This circuit has said that the greater extent of the variance from the guidelines requires a more needy justification. This is why, Judge Sullivan, I am pressing this willful blindness point. I don't think it is an errant phrase. The court speaks to the period of time before it became publicly available. And the court says, she maintains she was an innocent bystander to Ramirez's abhorrent conduct, completely blind to his crimes and the sex trafficking that occurred within the Mexican community. As I have said, I find any such blindness was willful and cultivated. And Ms. Bronfen's sentence can and should serve to deter other people who find themselves in situations in which they can choose either to confront or avert their gaze from the harm brought by their actions and the actions of those to whom they are close. That has absolutely nothing to do with the after the fact portion of the judge's opinion. And I do admit that that's one of the bases. This has to do with his finding that during the time of the existence of Doss, she was willfully blind to it and that her sentence, quote, can and should serve to deter others, unquote, who are in that similar situation. And that's why it was relevant. We never had an opportunity to respond to that. And in fact, we brought up this notion of mens rea because we asked for a fatico based on the fact that the PSR. Yes, your honor. The question I very much wanted to put to you before you sat down. It's not clear to me, at least based on your briefs, that you're that you challenge the district court's September 24, 2020 order denying your motion for a fatico hearing. That is, Judge Garifuss did deny your motion for a fatico hearing. You didn't make anything of it before us. Is that right? Before this court? Yeah. Correct, your honor. We're not challenging. That's not the basis of this appeal. I raise that to say that when we attempted to talk about the mens rea because of a sentence in the pre-sentence report that we thought was horrifically wrong, the court said no. It's fundamentally unfair to then say, well, I'm going to use her mens rea in order to enhance the sentence. Our point is that you can't have it both ways. If her mens rea is one of the reasons that the district court enhanced the sentence, then fundamental notice requirements, the most basic notice requirements, suggest that we ought to have an opportunity to respond to that. And below absolutely did not. Thank you very much, Mr. Sullivan. I've given you almost three times as much time as originally envisaged, but you and Mr. Tully will each have one minute rebuttal. Fair enough. Thank you. Ms. Hedjar? Ms. Hedjar? Good afternoon, and may it please the court. My name is Tanya Hedjar. I represent the government on this appeal, and I represented the government at trial before the district court. With the court's permission, I will address the arguments raised by Mr. Tully, counsel for Raniere, and my colleague, Kevin Trowell, will address the arguments raised just now by counsel for Ms. Bronfman. I'd like to start where Mr. Tully began, which was the limitations on cross-examination of Lauren Salzman, the cooperating witness who testified in the case. Raniere's counsel indicated that the record was unclear about how much time counsel at trial intended to cross-examine Ms. Salzman, but the record is quite clear about that. The record reflects that Raniere's counsel had indicated to the court that he had approximately 15 more minutes, that he intended to conclude by the end of the day. This is Government Exhibit 395, Government Appendix 395, and that he was nearing the end of the cross-examination. That's Government Appendix 384. And Judge Garifuss's ruling at the end of the trial denying the motion for the mistrial reflects that. He stated, you told me, this is addressing counsel for Raniere, you were going to finish by the end of the day. It was about 10 to 5 at the time that I instructed you to sit down, because you were not following my instructions about the questions you were asking and placing the witness in some peril of having a breakdown, as you pointed out at the time. And just to respond to Mr. Tully's point about redirect, there was no redirect in that case. The cross-examination and examination of this all has been terminated at the end of this colloquy. Counsel for Raniere fails utterly to identify, both in the briefing before the district court and in his appellate briefs, what questions, if any, he would have asked on cross-examination. Well, they sound like they would have been the standard things that you ask, I guess, at the end of a cross of a cooperator, which is you're looking at a lot of time. Unless the government writes you this letter, you're going to be facing a gazillion years. That's just sort of that usual stuff. Yes. And I would note, Your Honor, that the cooperation agreement was in evidence. But even more critically here, there was no effort. This was an unusual treatment of a cooperating witness, in the sense that there was no effort to challenge Ms. Salzman's credibility throughout the cross-examination. Counsel at no point attempted to cast Ms. Salzman as incredible or a liar, or that she was lying, that the lie was occasioned by her agreement with the government. Rather, counsel made a strategic choice, used open-ended questions throughout cross-examination to elicit favorable testimony that he made use of in summation. Turning then to, unless the court has further questions, turning then to the argument set forth in Ranieri's supplemental brief regarding the district court's instruction on commercial sex, the complaint that Ranieri's counsel makes regarding the substitution of the phrase because of, or on account of, was not preserved. And in any event, it's meritless because the instruction given was accurate. There is no difference between those phrases, and there was no error in the charge, much less plain error. Could you address the introduction of the abortion evidence and how that really is relevant? And if it couldn't have been done in a way that was much less prejudicial? And, you know, we almost always give the district court full discretion in that. But wasn't this really a bit going out of the way? Yes, Judge Calabresi. The district court didn't abuse its discretion in permitting the government to introduce two fairly limited types of evidence regarding abortion in this case. And that evidence was, first, Daniella's testimony regarding having underwent an abortion, as well as her sister Camilla, and the medical records that were introduced for the purpose of demonstrating that Camilla had indicated to medical professionals that she had been five years with partner and she was 18 at the time of that statement. That was the, that were the two categories of evidence of abortion. And what's significant here and what the district court recognized was that Daniella's testimony made clear that Pamela Cafritz, and that's the woman referred to in Ranieri's brief as Ranieri's closest confidant and supporter, brought Daniella to the clinic and told Daniella to lie about the identity of the father of her child and her immigration status. And Cafritz subsequently accompanied Camilla to the same clinic and instructed Daniella and Camilla about what to say and what to do at the clinic and, quote, made sure everything went according to plan. The district court acknowledged the sensitivity of the evidence relating to abortions, but found it relevant to both the child exploitation charges and the lengths to which Pamela Cafritz, who was a member of the enterprise, went to groom Ranieri's sexual partners, which was among the means and methods that were alleged in the enterprise and who were, it was involved very much. Wasn't there a lot of evidence that could have been introduced to make the same points about timing and something else which wouldn't go into that issue, the issue of abortion, which is the hottest issue in modern, in current life today in the United States? I mean, we're not talking about a simple issue which is somewhat prejudicial or something. We're talking about something that is in the newspapers every single day. Now, the government introducing that is doing something that's rather dramatic. And I know this is the court's discretion, but isn't this a case where one could say it's just not been wisely exercised? I apologize, Judge Calabrese. I couldn't hear the end of your remarks. But with respect to your question about— Hold on a second. Judge, would you care to repeat your remarks? Yeah. We don't normally say that this is something that is out of line, but wasn't given the current situation, that it might be appropriate to say that the district court just went beyond what is appropriate discretion. Judge Calabrese, I believe the district court did appropriately balance the potential prejudice here with the probative value of the evidence. I will note there was far greater evidence of abortions that could have been introduced but was not. The evidence that the judge directed the government to be circumspect about what it admitted and what testimony it introduced. And the government asked the witness to describe her experience, which she did, and described what, again, the woman that Ranieri says is his closest confidant and supporter and was part of the charge enterprise did in connection with concealing the identity of Camilla, the father of the child of both Daniela and Camilla, and asking them to lie about other salient details, including their immigration status, that her involvement in that was significant and important to establish, Your Honor. And I do think it was done with sensitivity to the subject of abortion and what it could mean. Thank you. Unless Your Honors have further questions, I will. Yes, Your Honor. To go back to this clerical inquiry of mine, to Ranieri's counsel, you recall the unredacted copy of the memorandum and order of Judge Garifas of May 3, 2019? May 3, 2019. May 3, yes. Sorry. Ruling on Ranieri's motions in limine. May I just have a moment to look at the time machine? Sure. It's really a mechanical concern of mine. If Ranieri's counsel has any difficulty, I'm sure you'll be able to help him get the document, the redacted document before us. Yes, of course, Your Honor. We'll do that. Okay, thank you. Good afternoon, Your Honors. May it please the Court, Kevin Trowell for the United States. I'll be addressing the arguments raised by counsel for Claire Bronfman. Here, as in Ms. Bronfman's briefs, counsel focuses largely on the term willful blindness. I think as the government has argued in our briefing, counsel has imbued that term with a meaning that simply isn't present in the judge's opinion.  In which references on no fewer than six occasions that the judge was not holding Ms. Bronfman legally culpable for DOS. Judge Calabresi raised a question about whether Ms. Bronfman's argument is really about substantive unreasonableness. And I think there are a couple of important responses to that. One, the Court's standard in that regard is shocking, shocks the conscience. It's a very difficult standard to meet. And one may fairly ask, I think, whether it could be met if the defendant's own conscience weren't so shocked. And therefore, she didn't raise it in her own brief. But I think putting that aside and putting the sort of party's arguments aside of the party presentment rule, there is potentially a good reason for this. And I'm certainly not in counsel's head. But the kinds of crimes, the kinds of visa fraud crimes, 1324 crimes, that are most analogous to Clara Bronfman's crimes are not, for example, where an individual drives to the Canadian border, picks up somebody, drives them back to New York City in exchange for $1,000. There are a number of cases on this Court's docket charging the statutes that Ms. Bronfman was charged with that involve facts like that. This is not that case. This is far more analogous to cases like Vargas-Cordone, 733 F3rd 366, or Sabhani, S-A-B-H-N-A-N-I. Those are cases where the fraud is part of a broader scheme that involves a form of servitude. And those cases are far worse. There's no question. So in Vargas-Cordone, there was sex abuse. In Sabhani, there was physical abuse. But the sentences there were also appropriately higher. So it was 120 months in Vargas-Cordone, 132 months in Sabhani. There were other crimes. There's certainly other context. But what Judge Garifus was focused on here is the kind of crime that the defendant committed was far from a run-of-the-mill visa fraud. And it involved a form of servitude that led these individuals to come to the U.S. based on promises that she made. They were unpaid. They were in precarious financial positions. They were sort of emotionally manipulated by Ms. Bronfman, among others. And her callousness to that played a significant role, no question, in the judge's decision. And quite fairly, given the- The government itself only suggested a sentence which was above the guidelines but well below this one. And Judge Garifus seems to focus on things like the fact that she used considerable money, which I don't think is relevant. Whether somebody is rich or poor doesn't make any difference. To pay for this guy's defense. Now, isn't it shocking to have a sentence go up because somebody chooses to use her money to help pay the defense of an absolute scoundrel? Respectfully, Your Honor, I think that question makes an error similar to the one that Claire Bronfman's counsel makes in the brief, which is to suggest that any one point drove the court's sentence. And I think that's simply not borne out by a fair reading of the court's opinion, which is both lengthy and detailed. And it's also, I think in addition, quite careful to compartmentalize the factors the court's considering about the seriousness of the crime, the characteristics of the defendant, and to cabin those in the places they belong. I think, Your Honor, it's not quite accurate to say that she was punished because of her wealth. And in fact, Judge Gariffis expressly said, there's, of course, no problem with wealth. That's not the issue here. But what is at issue, and what is fairly considered as a part of the defendant's history and characteristics, are the ways she used the wealth in furtherance of the activities of the enterprise, and Keith Ranieri in particular, in ways that, as the court also fairly found and that aren't contested on appeal, led to and certainly contributed to some of the criminal activity that was proven at trial, including the crimes that she herself participated in. I think the point about whether her paying for the defense is salient insofar as it related to the court's conclusion that Ms. Bronfman had failed to see the error of her ways even after trial. So part of the argument, and this goes to the point about willful blindness and what I think the court intended here, she made a point at sentencing, I think she makes this point in her appellate brief, that she was unaware of all the details. That was true to a point. But beginning in 2017, when she became aware of DOS, those details were available to her. And certainly after trial, the world was aware of those details. They were made public every single day. And the horrors of Keith Ranieri's treatment of members of, you know, victims of the enterprise was known to all. And still at sentencing, her position was not, I'm sorry, I've made a mistake, I now see this, but rather I support him, he changed my life for the better. And that, too, was a point, not the most important point, but a point in the constellation of points that Judge Garifuss relied on in imposing his sentence as he did of 81 months. Thank you very much. Thank you, Your Honor. All right, Mr. Tully, you're still with us, I'm sure. You've reserved one minute. Thank you very much. I will address counsel's points. In terms of cross-examination, it is a very fluid process. Fifteen more minutes, I would say, every person who has advocated in court knows that that is not an accurate statement. Furthermore, cross-examination, oftentimes you want to end on a crescendo. That was cut off. But why would it have been a crescendo? I'm trying to figure that out. I mean, highlighting her, the cooperators, the fact that she's looking at a potential sentence, what her plea agreement said, I mean, these are all things that would undermine the jury's confidence in this witness. But it seemed like this witness's credibility was not really attacked in summations, was it? Exactly. So I would concur on that point. The witness's credibility was not correct because the intent of cross-examination was to elicit testimony regarding the intent or state of mind as it relates to racketeering. If her state of mind was to produce goodwill in the world, clearly this wasn't racketeering. And that's precisely why her credibility was not questioned. So that's not an issue. The defense attorney was building to a crescendo of getting to her intent on racketeering. The judge said he cut it off because the trial counsel was going in and wanted it to end. That's not true. The court said, the court listened to the question and said you may answer. The government just brought up that the court said that the witness needed a composure break. And that was not true because, again, the court twice tried to elicit the government to engage in recraft or redirect. And the government declined to do so. So the government wasn't foreclosed from doing it where the defense was. In terms of abortion, images of fetuses were shown to the jury. So that is highly prejudicial. Images of fetuses that were eventually aborted were shown to the jury. Again, highly prejudicial. And back to the last time counsel's statements on the because of, think of any sex act in the world, and the jury instruction covers this. A commercial sex act is any sex act of which anything of value is given to or received by any person because of such sex act. So because of the union to produce this court, one of the first things I said was that I was honored to be here. Anything of value does not need to involve monetary exchange. I'm honored to be here. This court is here. That makes all the unions that produce this court a sex act. It's so wide open and deep and observable, and this court must put an end to it, respectfully must remand this case back to the district court. Thank you, Mr. Talley, very much. Mr. Sullivan, you've reserved the minute. Court's brief indulgence. Thank you, Judge. So first I will address Judge Calabresi's point. Yes, clearly, Ms. Bronfman was punished for her wealth. It is spread throughout the transcript, comments about her wealth, her privilege. Clearly that was part of the punishment. To the extent that's a substantive due process violation, it does shock the conscience. It shocks my conscience as well. Well, I'm not sure it shocks mine, so explain this to me. So if you have tremendous wealth and you use that to destroy the enemies or the people who are opposed to what ends up being a RICO enterprise, that's not something that the court should or can consider? It's an erroneous fact that Ms. Bronfman used her wealth to destroy the enemies of a RICO enterprise. In fact, the record shows that most of the lawsuits Ms. Bronfman engaged in, she won. The notion that she abused people is simply factually untrue, and sort of clever syntax in the government's brief does not change that fact. If I may, the government mentioned Vargas Cordo. It's in the brief, and they attempt to justify this exaggerated sentence because it goes to, the government said, forms of servitude and abuse. I would remind the court that Ms. Bronfman pled to one count on the immigration issue of helping one individual across the border who wanted to remain in the Nixxiom family. That's the record. The other five or six people that the government keeps referring to was absolutely not part of Ms. Bronfman's plea, and indeed at the sentencing, the judge refused to use that as a basis to enhance the sentence. The second thing that Ms. Bronfman pled to had to do with misuse of a credit card, the beneficiary for the use of someone who was the beneficiary of the estate of the deceased. The record shows that when the lawyer said, you can't do that anymore, she stopped. Those were the two things she pled to. That is all. And this is why all of this talk about abuse and dust and sex trafficking that keeps spilling its way into Ms. Bronfman's case is wrong. It is inappropriate. Here's what we do have. These are the 3553A6 factors. And I'll direct this in part to Judge Calabresi, who doesn't like my procedural due process arguments. Ms. Mack pled to a RICO charge. A RICO charge. 168 to 210 is the sentencing guidelines. 168 to 210. She got 36 months. 82% departure. Salzman, a RICO. 87 months to 108 months. Zero time. Bronfman, no RICO. The two charges that I just met, that I just articulated, comparatively minor to those two, 21 to 27 months range. And the judge upwardly departed by 200% based on a host, at least in part, of improper factors. Now, the government said that it's more than one point drove the court to the decision. To the extent the government is inviting this court to articulate a new rule in the Second Circuit that if any argument somehow might justify a gross upward departure, then the sentence has to stand. I respectfully suggest that this court does not want to articulate such a rule. The majority rule is that if it is apparent that the court relied on an erroneous factor, an erroneous fact, then this court must reverse. So, for example, a fact that cocaine was made into crack cocaine. That's one of the cases we cite. Erroneous. No evidence to it. Court reversed. One of the factors that the court used. That is the standard. That's the correct frame for this court. I'm sorry, Your Honor. I see the red light and see you nodding. Not at all. Thank you very much. Very well. We'll reserve decision and we are adjourned. Court stands adjourned.